Filed 8/27/24  In re Israel T. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re Israel T., Jr., A Person Coming Under the Juvenile Court Law | B327425 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>　　Plaintiff and Appellant,<br><br>　　v.<br><br>Israel T., Sr.,<br><br>　　Defendant and Respondent.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>　　Respondent. | (Los Angeles County Super. Ct. No. 20CCJP04272) |

Appeal from an order of the Superior Court of Los Angeles County, Cathy J. Ostiller, Judge. Reversed and remanded with directions.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Avedis Koutoujian, Deputy County Counsel, for Plaintiff and Appellant.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Respondent Israel T., Sr.

No appearance for Respondent Superior Court of Los Angeles County.

_____

The Los Angeles County Department of Children and Family Services (Department) appeals from the juvenile court's order releasing seven-year-old Israel T., Jr. (Israel Jr.), to his father, Israel T., Sr. (Israel Sr.), pursuant to Welfare and Institutions Code section 361.[1] Israel Sr. does not challenge the court's jurisdiction findings that he sexually abused Israel Jr.'s 14-year-old half-sister I.F. over a several-year period, including forcibly raping her, fondling her breasts, rubbing his penis against her breasts and body, masturbating in her presence, and forcing her to orally copulate his penis. Because the evidence presented by the Department compels a finding that if Israel Jr. were released to Israel Sr. he would face a substantial danger to his physical health, safety, physical or emotional well-being, or of sexual abuse, we reverse.

---

[1]    Further undesignated statutory references are to the Welfare and Institutions Code.

2

# FACTUAL AND PROCEDURAL BACKGROUND

A. *The Referral*

On September 13, 2022 Israel Jr.'s mother, Adriana C., contacted law enforcement to report that Israel Sr. had sexually abused Adriana's 14-year-old daughter, I.F.[2]  According to Adriana, Israel Sr. sexually molested I.F. for two years while I.F. was in middle school, including on September 9 and 12, 2022 (the September 9 and September 12 incidents), and he raped I.F. on an unidentified date.  On September 13 the police arrested Israel Sr., and he was charged with continuous sexual abuse of a child.

B. *Police and Forensic Interviews, Medical Examination, and Police Reports*

    1. *September 13, 2022 police interviews*

On September 13 two police officers interviewed I.F. and her family at their home.  The interview was recorded on a body camera.  When the officers arrived, Adriana was crying and visibly upset.  Adriana told the police officers that Israel Sr. had inappropriately touched I.F. and put his penis inside her.  Adriana explained that I.F. was a slow learner who sometimes had difficulty expressing herself.

The police officers interviewed I.F. in the bedroom with Adriana and I.F.'s sister Guadalupe F. present.  I.F. was sitting on the bed with her face down.  She kept her head down, did not make eye contact, and cried during parts of the interview.  When officers asked I.F. when Israel Sr. last "touched" her, I.F.

---

[2]    Adriana is not a party to this appeal.

3

responded with respect to the September 12 incident, "Yesterday, he touched me. When I was eating." I.F. stated she did not recall the time, but Israel Sr. had touched her with his penis on her chest area. I.F. also reported that she saw Israel Sr. "touching himself" over his clothes during the same incident and she ignored him. The incident took place in the kitchen, no one else was in the kitchen area, and her brother was in the shower.

I.F. answered many of the officer's questions with yes or no responses, with few details. When asked whether Israel Sr. had touched her "upper body" on other occasions, including under her clothes, I.F. responded "yes." I.F. also responded affirmatively when the officers asked if Israel Sr. had touched the lower part of her body, including her buttocks and female areas. When asked whether the touching happened under or on top of her clothing, I.F. responded "both." I.F. also responded "yes" when she was asked if Israel Sr. had shown her his penis; if he made her touch him; if he put his penis in her mouth; and if he attempted to put his penis in her body. When asked if Israel Sr. had ever put his penis in her vagina or buttocks, I.F. stated, "I don't know." In response to a question about when the touching started, I.F. stated, "I think when I was in middle school."

The officers asked about incidents other than on September 12, and I.F. asked Guadalupe, "When did we go to Target?" Guadalupe responded that it was the prior Friday (September 9). I.F. stated that on that day Israel Sr. touched the front and back part of her "lower area" with his hand while they were both standing. The officer then asked if Israel Sr. had ever tried to put his fingers anywhere in her body, and I.F. responded "yes." The officers then took a break.

4

When they returned, the officers asked about the incident on September 9. I.F. stated she was in the bedroom after she had taken a shower, and she had her pajamas on. Israel Sr. came in and touched her buttocks over her clothing, then moved his hands under her clothing to touch her breasts and vagina. The officers asked whether Israel Sr. put his fingers inside of her, and I.F. responded "no." The officers then asked a second time if Israel Sr. put his fingers inside of her, and I.F. responded, "Yes, he used two fingers." I.F. stated nothing else happened on that day. She could not remember any other incidents.

An officer asked Israel Jr. if he had ever been touched inappropriately, and Israel Jr. denied being sexually abused.

2.  *September 13, 2022 SART exam*

A sexual assault response team (SART) examination was conducted on September 13 at a medical center, but I.F. was uncomfortable answering the questions about the sexual abuse. I.F. stated "[y]es" when asked whether there had been penile and digital penetration. She further stated Israel Sr. touched her upper right arm and breast area over her clothing. Oral swabs and external genitalia swabs were collected. However, I.F. declined to have other swabs taken because she felt uncomfortable, and Adriana terminated the examination.

3.  *September 14, 2022 police interviews*

On September 14, 2022 police detectives conducted follow-up interviews with I.F. and her family in their home. Adriana explained that the family lived together in their one-bedroom apartment. Adriana, Israel Sr., and Israel Jr. slept in the bedroom, and the three other children slept in the living room.

5

I.F. and Guadalupe slept on bunk beds, and Adriana's 19-year-old son Adrian slept on a single bed. Cristobalina, Israel Jr.'s maternal grandmother, slept on the couch in the living room. Adriana first learned of the abuse when she was called into the school counselor's office on September 13. I.F. was visibly upset and crying. After learning of the abuse, Adriana and Adrian went to Israel Sr.'s workplace to confront him about the abuse. He denied doing anything wrong and stated I.F. was lying.

Fifteen-year-old Guadalupe stated that on September 13, 2022 she was called into the counselor's office at school because I.F. was crying. Guadalupe then called Adriana to come to the school. I.F. disclosed to Adriana that Israel Sr. would put his private part inside of her, but I.F. was not certain where he put it. I.F. added that on numerous occasions Israel Sr. would grab her over her clothing. Guadalupe was unaware of anything inappropriate until I.F. disclosed the abuse in the counselor's office.

I.F. was tired, quiet, and had a difficult time talking. She recounted the incident when she was eating soup at the table and Israel Sr. poked her with his private part. The detectives asked what private part he poked her with, and I.F. "pointed at her crotch area."

Cristobalina and Adrian stated they were unaware of any inappropriate touching or sexual abuse by Israel Sr. Cristobalina stated Israel Sr. was a good man who supported his family, but she believed I.F.'s allegations. Adrian stated that on one occasion I.F. told him that Israel Sr. would touch her in the middle of the night, he would touch her skin-to-skin, and he would touch her with his penis. Adrian did not believe I.F. was "capable of coming up with this type of lie" about the sexual abuse.

6

Israel Jr. had difficulty answering questions but stated no one had ever touched him inappropriately and he had never seen anyone in his family be touched inappropriately.

The following day the detectives interviewed Israel Sr., who was detained. He explained he had no idea what was happening when Adriana confronted him at his job about the alleged sexual abuse. Israel Sr. explained he cared very much for the girls and did a lot to take care of the family. Israel Sr. stated he did not know why I.F. would make up the allegations against him but noted she had a learning disability. The detectives utilized a ruse and told Israel Sr. they found his DNA on I.F.'s private parts. Israel Sr. "did not have an answer," and, according to the detectives, he "never denied inappropriately touching or sexually abusing the victim."

4. *September 14, 2022 Inner Circle Child Advocacy Center forensic interview*

On September 14 Susy Flores from the Child Advocacy Center conducted a forensic interview with I.F. Flores began the interview by explaining to I.F. that if she did not know an answer, she should let Flores know; she should feel free to ask for clarification if she did not understand a question; and she should correct Flores if Flores stated something incorrectly.

After building a rapport with I.F. by discussing a video game I.F. enjoyed playing, Flores began asking questions about the sexual abuse allegations. During the interview, I.F. stated she was tired and did not feel well. The questioning proceeded with long pauses between the questions and I.F.'s responses. Flores asked about the September 12 incident. I.F. explained she was eating soup at the table and Israel Sr. was in the kitchen.

Israel Sr. came out and touched I.F. on her upper arm and shoulder area with "his part" while she was sitting at the table. I.F. explained it felt "[l]ike being poked." I.F. felt uncomfortable, and she ignored him. Israel Sr. appeared to gesture with "[h]is part" for her to come into the kitchen. He did so "by touching himself," although he had his pants on. I.F. ignored him. I.F. explained Israel Sr. was touching "his part." Flores asked I.F. if she had another name for "his part," and I.F. responded, "[his] private" and motioned to her pelvis. At the time the incident happened, Israel Jr. was taking a shower, Adrian was in his bed, her grandmother was on the couch, and her mother was sleeping.

Flores asked about the first time Israel Sr. touched her. I.F. stated they were on the bed watching a movie about "a different world humans went to a world filled with monkeys." I.F. sat in the middle of bed, and Israel Sr. sat on the side. They were both "in the blanket." Israel Sr. started moving closer to I.F., which made her feel uncomfortable. She "leapt away and went into the corner [of the bed]." I.F. could not remember how old she was when this happened. Adriana was home but in a different room.

At this point Flores paused the interview. When she returned, Flores said they were done with the interview for the day. She asked I.F. what she planned to do after the interview. I.F. said she was going to cry. She added, "I cry a lot" about "sad things."[3]

---

[3] According to a September 16, 2022 police investigation follow-up report, the district attorney declined to press charges against Israel Sr. pending a DNA analysis of I.F.'s and Israel Sr.'s examinations.

5. *The September and October 2022 social worker interviews*

On September 15, 2022 the social worker interviewed the family members privately at the family home. Adriana stated she and Israel Sr. had been together for eight years, and they had a good relationship and supported each other. Adriana never suspected something inappropriate was going on. Adriana described I.F. as a little "different," which she felt made I.F. an easy target.

Guadalupe described what I.F. told her on September 12 in the counselor's office, where she found I.F. crying. I.F. said that a few days earlier Israel Sr. rubbed his penis on her breasts and made her touch his penis, and she could not take it any longer. Israel Sr. had been touching her since middle school, and I.F. recounted several incidents, including when Israel Sr. put his penis inside of her. The incidents would occur in the kitchen or in the middle of the night when everyone was sleeping.

On September 22 the social worker met with I.F. privately. I.F. was in the bedroom "half asleep" and told the social worker she was tired and mostly takes naps during the day. I.F. appeared comfortable speaking with the social worker until the social worker brought up Israel Sr. I.F. refused to speak about what happened, noting only that Israel Sr. would make her strawberry smoothies and soup. The social worked observed that I.F. understood the questions, but she responded in a way that was younger than her age.

The social worker also met privately with Israel Jr. Israel Jr. missed his father and wanted to see him more often, but his father had to work. Israel Jr. confirmed that he knew what his private parts were and denied anyone had ever touched

9

them.  He was aware of the difference between appropriate and inappropriate touching, and he stated only a doctor was allowed to touch his private parts when they hurt.

Cristobalina stated she was very surprised to hear the allegations against Israel Jr.  She believed I.F., but she had a hard time understanding how the abuse could have happened because either she or Adriana was always home.  She observed Israel Sr. acting appropriately with the children, and he did not treat Guadalupe and I.F. differently.  Cristobalina believed Israel Sr. loved the children as his own.  Israel Jr. was very attached to his father and would sleep in the bedroom with him because Adriana worked the night shifts.

On October 7, 2022 the social worker interviewed Israel Sr. at the social worker's office.  Israel Sr. explained Adriana and Adrian confronted him at work about I.F.'s sexual abuse allegations and he had no idea what they were talking about.  He stated he had not and would never hurt any of the children.  Israel Sr. denied any prior criminal history, medical problems, mental health issues, substantive abuse, or domestic violence.

On October 26, 2022 the juvenile court authorized the temporary removal of Israel Jr. from Israel Sr.

C.    *The Dependency Petition and Detention*

On October 28, 2022 the Department filed a section 300 petition on behalf of then-16-year-old Guadalupe, 14-year-old I.F., and seven-year old Israel Jr.  The petition alleged under section 300, subdivisions (b), (d), and (j), that Israel Sr.'s sexual abuse of I.F. in September 2022 and on prior occasions and Adriana's failure to protect I.F. and her siblings endangered their physical health and safety and placed them at risk of serious

10

physical harm and sexual abuse.  The petition specifically alleged that Israel Sr. "forcefully rap[ed]" I.F. by placing his penis in her vagina, caused I.F. to orally copulate Israel Sr.'s penis, fondled her breasts, masturbated in her presence, and rubbed his penis against her breasts and body.

On November 14, 2022 the juvenile court removed Israel Jr. from Israel Sr. and released him to Adriana.  The court ordered Israel Sr. to stay away from the family home and granted him three hours of monitored visitation three times a week at a neutral location.

D.    *January 4, 2024 Jurisdiction/Disposition Report and Last Minute Information for the Court*

In December 2022 the social worker privately interviewed I.F., Adriana, Guadalupe, Israel Jr., Adrian, Israel Sr., and Israel Jr.'s paternal aunt (Mabel T.).  The social worker asked I.F. if she recalled what she told Guadalupe at the counselor's office.  I.F. nodded yes, and she began to cry.  After a few moments, I.F. stated, "'The police told me to answer questions and say yes or no.  It's easier than saying details.'"  I.F. was able to identify her body parts by name.  When the social worker began reading the allegations against Israel Sr., I.F. stated, "'It's true.'"  The social worker then asked I.F. where Israel Sr. had touched her inappropriately, and I.F. answered, "'Probably everywhere.'"  When asked whether she was touched under or over her clothing, I.F. said "[b]oth."  I.F. stated the incidents began "'[s]ince elementary or something.  I can't remember the dates.'"  Further, in response to the social worker reading the allegation that Israel Sr. inserted two fingers in her vagina, I.F. responded "'[y]es.'"  But when the social worker asked I.F.

11

specifically about the oral copulation and rape allegations, I.F. remained quiet with tears in her eyes and said she was sleepy and did not want to talk about it. The social worker noted that I.F. "seemed to avoid" the questions about the allegations and did not answer any open-ended questions.

Adriana stated that on September 13, 2022, when she picked up I.F. and Guadalupe from school, they were both crying. I.F. told her that "'Israel [Sr.] has been touching me.'" I.F. said "'she feels like she has PTSD. When he got home, his footsteps, the sound of the truck when he'd get here—she could just sense him coming.'" I.F. told her that when Adriana began working at night in 2018, Israel Sr. would go to her during the night and touch her. Adriana also recounted the same facts that I.F. previously told the police regarding the September 9 and 11 incidents, as well as two instances of rape (one in the kitchen while the family was outside, and one in the bedroom while I.F. was taking a nap). Guadalupe similarly described what I.F. said on September 13 about the sexual abuse.

Adrian provided additional details of what I.F. told him (and Adriana and Guadalupe) on September 12. Adrian stated, "'[I.F.] said the first time it happened was before we got the bunk beds. We used to have three different beds. This was my freshman year, so it was either in 2017 or 2018. [I.F.] said it would happen in the morning before my mom was home from work. . . . She said he would also target her whenever she was alone. One time she was washing the dishes and he pulled down her pants . . . and raped her. . . . She also said he threatened her and said he would kidnap her and my brother if she said anything. She said it was a regular thing.'"

Israel Sr. told the social worker as to the allegations, "'It's a lie—it's absurd. How can you rape a person you care for. At what point can such a thing happen? If we were always surrounded by people—no. At no time was I alone with her. There was always someone with us. For that to happen it would take time. I don't see the logic of such an accusation.'" When asked about masturbating in front of I.F. on September 14, 2022, Israel Sr. said he wasn't there because he had been arrested and detained by police.[4] Israel Sr. explained that when he was arrested, he declined to have a lawyer because he felt he did not need one. Israel Sr. stated, "'Everything that I am being accused of is false. There is no proof because it never happened.'"

Israel Sr. explained that he came into I.F. and Guadalupe's lives when they were very young. He was the one who cared for them, including cooking for them, and Adriana "'is not a bad mother, but she is not attentive with them and does not pay her children any attention.'" Israel Sr. stated he was sending approximately $400 per month to Adriana for Israel Jr.'s expenses. Israel Sr. was at the time living at his sister's home, but he planned eventually to get his own home. Israel Sr. was not enrolled in any services, but he was willing to do so in order to reunify with his son.

Mabel T., Israel Jr.'s paternal aunt, stated her belief that Israel Sr. had been falsely accused and was innocent. Mabel noted that Israel Sr., not Adriana, had been the one taking care

---

[4] The social worker mistakenly asked Israel Sr. about a September 14 incident, but I.F. reported that the incident occurred on September 11. Israel Sr. was arrested on September 13.

of Israel Jr., and that in his absence, Guadalupe was caring for Israel Jr.

The psychiatric social worker at the high school told the Department social worker that when I.F. came to her office on September 12, she sat down and started hysterically crying for about 40 minutes. She did not respond to the social worker's questions. The counselor called Guadalupe into the office, and the two girls talked privately for five to 10 minutes. When the social worker returned, both girls were crying and would not speak. They asked for their mother to pick them up. The school counselor stated that after I.F.'s report about the sexual abuse she was absent a lot. The counselor added, "'She's nervous—anxious—about being in school. The first couple of days were kind of rough. Then she started missing school. She doesn't say a lot. When stressed, she has a meltdown and it takes a long time for her to calm down.'" According to a high school staff member, I.F. had an individual education plan (IEP) in place due to a learning disability. Since I.F. disclosed the abuse, I.F. sometimes cried in class. I.F. did not explain why she was crying, and when the school staff member asked I.F. how she was doing, I.F. would begin to cry.

The Department stated in its January 11, 2023 jurisdiction/disposition report that there was a substantial danger to the children's well-being based on Israel Sr.'s sexual abuse of I.F. The Department conducted a risk assessment and concluded the family was at "'very high'" risk. It recommended continued detention of Israel Jr. from Israel Sr.

The February 24, 2023 last minute information for the court reported that Guadalupe, I.F., and Israel Jr. were living with Adriana. Israel Sr. had monitored visits with Israel Jr.

14

twice a week without problems. Guadalupe and Israel were doing well, but I.F. was struggling with her mental health and refusing to go to school or leave the house. She spent the majority of her time in bed and reported that she was always tired. She was "quiet and often shuts down." The family members had started individual therapy. Adriana, Adrian, and Guadalupe stated that they all believed I.F.'s statements and did not believe she had a reason to lie. The social worker reported that I.F. had disclosed to her mother that Israel Sr. had threatened to "'kidnap'" her and Israel Jr. if I.F. told anyone what had happened. Israel Sr. continued to deny the allegations. He acknowledged he had not enrolled in any services, but stated he was not aware he was ordered to do so.

E.      *The Jurisdiction and Disposition Hearing and Amended Petition*

At the March 22, 2023 jurisdiction and disposition hearing, the juvenile court admitted the Department's prior reports; a DVD containing body camera footage of the September 13, 2022 interview with I.F.; and a DVD containing the September 14, 2022 forensic interview with I.F, including a transcription.[5] No testimony was presented at the hearing.

---

[5]      The juvenile court excluded the Department's Exhibit 7, a transcription of the September 13 police interview of I.F., as unnecessary given the DVD of the interview and the "very thorough [March 21, 2023 last minute information] describing the interview." We granted the Department's November 1, 2023 motion for judicial notice (which we deemed a motion to augment the record), which included a transcription of the September 14, 2022 forensic interview of I.F. In its motion the Department

15

Counsel for Israel Sr. argued the petition should be dismissed based on lack of evidence because I.F., after disclosing the sexual abuse, was not "able to describe or verify the statements that she allegedly made to her family." Israel's counsel observed that in the September 13 police interview, as shown on the videotape, I.F. was only able to answer yes-or-no questions, provided no additional details about the alleged abuse, and did not make any eye contact. Counsel argued this was "because [the abuse] didn't occur and that she feels a certain amount of guilt about having made the allegations to her mother." Counsel also described I.F. being "more tight-lipped" during the subsequent forensic interview. Further, following a police investigation, no criminal case was filed against Israel Sr. In addition, "[t]he statements [about Israel Sr.'s alleged abuse] seem to be coming primarily from mother and the allegations that [I.F.] told her mother of these details," and although I.F. confirmed what she told her mother about the abuse, I.F.'s statements "lack[ed] the indicia of reliability . . . [the] court need[ed] in order to sustain, again, this extremely serious allegation against my client." Counsel reiterated that Israel Sr. maintained his innocence and referred to the allegations as "absurd."

The attorney for I.F. and Guadalupe urged the juvenile court to sustain the petition as alleged. She highlighted I.F.'s descriptions of abuse, including that Israel Sr. had touched her

explained the appellate record inadvertently included a transcription of the police interview, rather than a transcription of the forensic interview. We have not considered the transcription of the police interview because it was excluded by the juvenile court.

16

for the first time while they were watching a movie together and had touched her inappropriately multiple times over and under her clothing since elementary school. In addition, I.F. answered affirmatively when asked during her police interview whether Israel Sr. had touched her breasts, showed her his penis, touched his penis in her presence, made her touch his penis, and placed his penis in her mouth and in her body. I.F. had remained consistent in her responses, and she had not recanted any of her statements. Moreover, given I.F.'s "possible learning disabilities," it was "highly unlikely that she would have reason to lie about the sex abuse allegations."

Israel Jr.'s attorney similarly argued the petition should be sustained as alleged. Specific to Israel Jr., counsel argued Israel Sr.'s "conduct towards [I.F.], the severity, the duration, the fact that it happened in the family home in plain sight while my client was in the home does put my client at risk . . . ."

The attorney for the Department argued that I.F. presented with a learning disability, which supported an inference "that she doesn't really have the capacity to create allegations like this unless it otherwise happened." Further, it made it harder for I.F. to verbalize what happened in contrast to a person without a learning disability. The attorney noted that I.F.'s responses and demeanor were "not uncommon due to children being embarrassed about what happened, due to them not wanting to relive the trauma . . . ."

The juvenile court found by a preponderance of evidence that the allegations under section 300, subdivisions (d) and (j), as

17

amended,[6] were true as to Israel Sr.  The court observed as to I.F., "the way she presents in the interview, . . . her comments, her responses are all indicative of a child that has gone through significant trauma," and "her emotional reaction is entirely consistent with somebody who has suffered what she has suffered."  The court found I.F. "to be quite credible" and, notwithstanding any learning disabilities, "she made it very clear" that she had been abused.

The Department argued that Israel Jr. should be removed from Israel Sr. given that the juvenile court had sustained the sexual abuse allegations, and "in light of how intensive and how long that this trauma and abuse was going on in the home where other children are present."  Further, Israel Sr. had "not addressed any of his sexual proclivities."  Counsel for Israel Jr. joined the Department's recommendation, arguing the Department had met its burden for removal by clear and convincing evidence.

Israel Sr.'s attorney argued that Israel Jr. should be released to Israel Sr. because the Department failed to demonstrate by clear and convincing evidence that doing so would pose a substantial risk to Israel Jr.  He asserted Israel Sr. had not acted inappropriately towards Israel Jr. and Israel Jr. was "differently situated" from I.F. given that he was a male and a biological child of Israel Sr.  Further, there was no evidence

---

[6]     The juvenile court granted the Department's request to amend the petition to change the date of the kitchen incident to September 11 instead of September 14, 2022.  The court also found Adriana was nonoffending and struck the allegations under section 300, subdivision (b)(1), that Mother failed to protect I.F.

that Israel Sr. would "turn to abuse of a biological son as opposed to a non[-]biological daughter."

The juvenile court ordered Israel Jr. released to Israel Sr. over the objections of the Department and Israel Jr., finding the release "would not be detrimental to the safety, protection, or physical or emotional well-being of the child." Further, the court found that services were "available to prevent detention," but it did not otherwise indicate the reasons for its decision. The court ordered Adriana's home would be Israel Jr.'s primary residence, with the Department to make unannounced home visits to check on Israel Jr., and the court ordered the Department to provide Adriana and Israel Sr. a referral for family preservation services. Additionally, Israel Sr.'s case plan required him to participate in parenting classes, sex abuse counseling for perpetrators, and individual counseling. The court ordered I.F. and Guadalupe removed from Israel Sr. and released to Adriana. ~(RT 936)

## DISCUSSION

A.  *Applicable Law*

Section 300, subdivision (d), provides that the juvenile court may exercise jurisdiction over a minor who "has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by the child's parent or guardian or a member of the child's household . . . ." Section 300, subdivision (j), provides that jurisdiction may be assumed over a child whose sibling has been abused or neglected as defined in subdivision (d) of section 300 and "there is a substantial risk that the child will be abused or neglected . . . . The court shall consider the circumstances

19

surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child."  The Department has the burden to prove jurisdiction findings by a preponderance of the evidence.  (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248; *In re E.E.* (2020) 49 Cal.App.5th 195, 205-206.)

Section 361, subdivision (c)(1) and (4), provides with respect to removal of a child once the juvenile court declares a child to be a dependent child of the juvenile court, "A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . :  [¶]  (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody.  [¶] . . . [¶]  (4) The minor or a sibling of the minor has been sexually abused, or is deemed to be at substantial risk of being sexually abused, by a parent . . . and there are no reasonable means by which the minor can be protected from further sexual abuse or a substantial risk of sexual abuse without removing the minor from his or her parent . . . ."  In considering whether a risk of detriment exists sufficient to justify removal, "'the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention.'"  (*In re M.D.* (2023) 93 Cal.App.5th 836, 856;

20

accord, *In re D.B.* (2018) 26 Cal.App.5th 320, 332; *In re A.S.* (2011) 202 Cal.App.4th 237, 247, disapproved on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) It is the Department's burden to prove by clear and convincing evidence that removal is necessary. (*Cynthia D. v. Superior Court, supra,* 5 Cal.4th at p. 248; accord, *In re E.E., supra,* 49 Cal.App.5th at pp. 205-206.)

"In general, when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B., supra*, 9 Cal.5th at p. 1005, fn. omitted.) However, where, as here, the juvenile court has determined the Department did not satisfy its burden of proof, we ask whether the evidence compels a finding in favor of the Department as a matter of law. (*In re Luis H.* (2017) 14 Cal.App.5th 1223, 1227; *In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1156; see *In re D.C.* (2021) 60 Cal.App.5th 915, 921.) Specifically, the Department must demonstrate its evidence "'was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."'" (*In re Luis H.*, at p. 1227; accord, *In re D.C.*, at p. 921.)

B.    *The Evidence Compels a Finding in Favor of the Department as a Matter of Law*

The Department contends its evidence supporting removal of Israel Jr. from his father—the egregious sexual abuse of I.F.,

21

Israel Sr.'s ongoing denial of any abuse, and Israel Sr.'s failure to address any of the issues giving rise to dependency jurisdiction—compels a removal finding in its favor. The Department further argues Israel Sr. cannot contest this evidence, which the Department relied on to establish jurisdiction, because Israel Sr. does not challenge the jurisdiction finding on appeal. Israel Sr. responds that his failure to challenge the jurisdiction finding does not mean there is clear and convincing evidence that Israel Jr. must be removed from him, given the lower evidentiary standard to support jurisdiction (by a preponderance of the evidence). Israel Sr. argues he never abused Israel Jr., and Israel Jr. and I.F. are differently situated because Israel Jr. is a biological child and male.

We agree with Israel Sr. that the juvenile court's jurisdiction finding that Israel Jr. was at substantial risk of harm from Israel Sr.'s sexual abuse of I.F. does not mean removal is necessary given the higher standard of proof for removal. (Compare § 300 with § 361, subd. (c); see *In re E.E., supra,* 49 Cal.App.5th at p. 218 [a finding that a child is a dependent generally does not serve as prima facie evidence for removal].) Rather, we must determine whether there is clear and convincing evidence that if Israel Jr. was not removed, there would be a substantial danger to his physical health, safety, protection, or physical or emotional well-being, or a substantial risk of being sexually abused, with no reasonable means to protect Israel Jr. absent removal. Further, because the Department had the burden in the juvenile court, on appeal the Department must show its evidence was uncontradicted and unimpeached and of such character and weight that it compels a finding in favor of the Department. That high bar is met here.

In analyzing the risk of detriment to support removal, we consider evidence about "'the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention.'" (*In re M.D., supra,* 93 Cal.App.5th at p. 856.)  In addition, because the juvenile court sustained the petition on behalf of Israel Jr. based on abuse of his half-sister pursuant to section 300, subdivision (j), we find instructive the factors set forth in subdivision (j) for assessing harm, as well as the Supreme Court's guidance in *I.J., supra,* 56 Cal.4th 766 on how to analyze the risk of harm to a child where a parent has sexually abused the parent's child of a different gender.

In *I.J.*, over the course of three years, the father repeatedly sexually abused his oldest daughter, including fondling, digital penetration of her vagina, forcible rape, and oral copulation. (*I.J., supra,* 56 Cal.4th at p. 771.)  In affirming the juvenile court's jurisdiction finding that the father's sons were at substantial risk of harm, the court focused on the duration and nature of the sexual abuse inflicted on the daughter, describing it as "'aberrant in the extreme,'" and explaining "a father's prolonged and egregious sexual abuse of his own child may provide substantial evidence to support a finding that all his children are juvenile court dependents." (*Id.* at pp. 770, 778.)  "'Also relevant to the totality of the circumstances surrounding the sibling abuse is the violation of trust shown by sexually abusing one child while the other children were living in the same home and could easily have learned of or even interrupted the abuse." (*Id.* at p. 778.)  The court acknowledged that "'[a]lthough the danger of sexual abuse of a female sibling in such a situation may be greater than the danger of sexual abuse of a

male sibling, the danger of sexual abuse to the male sibling is nonetheless still substantial.' [Citation.]  The juvenile court need not compare relative risks to assume jurisdiction over all the children of a sexual abuser, especially when the abuse was as severe and prolonged as here." (*Id.* at p. 780; see *id.* at p. 778 ["the more egregious the abuse, the more appropriate for the juvenile court to assume jurisdiction over the siblings"].)

Although *I.J.* was decided in the context of a challenge to the jurisdiction findings, the Supreme Court contemplated that sexual or physical abuse of a child could lead to removal of siblings of a different gender:  "'[S]exual or other serious physical abuse of a child by an adult constitutes a fundamental betrayal of the appropriate relationship between the generations. . . . When a parent abuses his or her own child, . . . the parent also abandons and contravenes the parental role.  Such misparenting is among the specific compelling circumstances which may justify state intervention, *including an interruption of parental custody*.'" (*I.J.*, *supra*, 56 Cal.4th at p. 778, italics added.)  Further, "when a father severely sexually abuses his own child, the court may assume jurisdiction over, *and take steps to protect*, *the child's siblings*." (*Id.* at p. 780, italics added; see *In re I.C.* (2018) 4 Cal.5th 869, 876 [citing *I.J.* for the proposition that the juvenile court "may also order that the child be removed from a parent's physical custody if there is clear and convincing evidence that removal is necessary to protect the child from a substantial risk of harm"].)

With respect to evidence of the circumstances surrounding Israel Sr.'s sexual abuse of I.F., the Department relies in part on the same evidence the juvenile court found sufficient to establish jurisdiction.  (See *In re Andy G.* (2010) 183 Cal.App.4th 1405,

24

1415 [explaining in affirming juvenile court's order removing son from father based on sexual abuse of half-sisters, "the record contains sufficient evidence, as described ante [in support of the jurisdiction findings], from which a reasonable trier of fact could find a substantial danger to Andy by clear and convincing evidence."].) The court asserted jurisdiction over Israel Jr. based on Israel Sr.'s sexual abuse of I.F. on two occasions in September 2022, which involved fondling, digital penetration, and masturbation in front of I.F. The court also found that on prior occasions Israel Sr. "forcefully rap[ed] the child by placing [his] penis inside the child's vagina," forced I.F. to orally copulate him, and rubbed his penis against I.F.'s breasts and other parts of her body. In sustaining these allegations, the court found I.F. was credible. On appeal, Israel Sr. does not contest the factual findings that supported dependency jurisdiction or the juvenile court's ruling on I.F.'s credibility.

With respect to the nature of the abuse, Israel Sr.'s sexual abuse of I.F. was, as in *I.J.*, egregious and prolonged. (See *I.J., supra,* 56 Cal.4th at p. 778.) I.F. was interviewed by the police, a forensic interviewer, and social workers over several months, and she made consistent statements about how Israel Sr. had sexually abused her. Although I.F. gave yes-or-no answers to many of the interviewers' questions, I.F. identified in detail the September 9 and 11 incidents. I.F.'s description of what happened—told both to family members and the interviewers— did not change, and she did not recant her statements. Further, Adrian recounted that I.F. told him the abuse had been going on for at least four years (since 2017 or 2018), and I.F. told the social worker the abuse had been going on since she was in elementary school. In addition, I.F. exhibited the effects of trauma—crying

25

hysterically in the counselor's office the day after the incident in the kitchen, crying at times following the disclosure, sleeping most of the day, and refusing to go to school or leave the house.

Israel Jr.'s age is also relevant. Israel Jr. was seven years old at the time of removal, just two or three years younger than the age Israel Sr. first started to sexually abuse I.F. (at nine or 10 years old). (See *In re P.A.* (2006) 144 Cal.App.4th 1339, 1345 [affirming dependency jurisdiction over father's sons, observing the sons were five and eight years old, and the daughter was nine years old when father began to abuse her].)

With respect to the mental condition of the parent, it is undisputed that the sexual abuse took place in the family home while family members, including Israel Jr., were at home. That the abuse took place in the family home meant Israel Jr. could have been exposed to the abuse, and given his young age, had he learned of the abuse, this would have placed him at further risk of harm. Israel Sr.'s sexual abuse of I.F. in the home shows his violation of trust to his children and lack of concern for their well-being. (See *I.J., supra,* 56 Cal.4th at p. 778 [father's abuse of daughter while other children living in the home could have easily learned of or seen the abuse violated father's relationship of trust, contravened father's parental role, and could "'justify state intervention, including an interruption of parental custody'"]; *In re Andy G., supra,* 183 Cal.App.4th at pp. 1414-1415 [affirming jurisdiction findings and disposition order, observing that father who exposed himself to son's half-sister while son was in the same room "evinces, at best, a total lack of concern for whether Andy might observe his aberrant sexual behavior"].)

26

Moreover, Israel Sr. repeatedly denied he had sexually abused I.F., increasing the risk of harm to Israel Jr. if released to his father because "[o]ne cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197; see *In re A.F.* (2016) 3 Cal.App.5th 283, 293 ["In light of mother's failure to recognize the risks to which she was exposing the minor, there was no reason to believe the conditions would not persist should the minor remain in her home."].) In addition, the disposition hearing took place approximately four months after the detention hearing at which Israel Jr. was removed from his father's custody. During that time, although Israel Sr. expressed his willingness to do anything to reunite with his son, there was no evidence Israel Sr. took any steps to alleviate the causes necessitating the filing of a dependency petition.

The record does not reflect any reasonable means to protect Israel Jr. absent removal. The juvenile court ordered unannounced home visits and a referral for family preservation services. However, unannounced visits by a social worker would not alleviate the significant risk that Israel Sr. would sexually abuse Israel when the social worker was not present. (See *In re D.C.* (2015) 243 Cal.App.4th 41, 56 [where mother failed to protect her daughter from father's year-long course of sexual abuse and minimized the abuse, "[t]he evidence supports the finding that the measures [mother] suggests, including 'in-home services, unannounced visits, and therapy for the parties,' would not have addressed the substantial risk evident in leaving the minors with [parent] unsupervised"]; *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2006) 145 Cal.App.4th 692, 699 [family court abused its discretion in allowing father, who had sexually abused his child, to return to

27

live with his son on the condition his contact be monitored because "the concept of monitored visitation is fundamentally incompatible with around-the-clock in-home contact"].) Moreover, Israel Sr. had sexually abused I.F. in the home while other family members were present, making it unlikely that the possibility of an unannounced visit by a social worker would lessen the likelihood of sexual abuse of Israel Jr. (especially given that Israel Sr. could simply not answer the door).

Israel Sr. does not on appeal challenge the jurisdiction finding, including the underlying facts supporting the jurisdiction order, instead arguing we should affirm the juvenile court's order releasing Israel Jr. to his care because Israel Jr. and I.F. are differently situated given that Israel Jr. is a biological child and male. Israel Sr.'s argument is not persuasive.

As in *I.J., supra,* 56 Cal.4th at pages 770 and 778, in which the Supreme Court found a substantial risk of harm to the daughter's three male siblings, Israel Sr.'s sexual abuse of I.F. was "aberrant," "prolonged and egregious." Although the risk to Israel Jr. may have been lower than that posed to his half-sister Guadalupe, in light of the egregiousness of the sexual abuse, the risk of harm to Israel Jr. if he were returned to live with Israel Sr. was substantial. (See *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 968, 970 ["[c]ases overwhelmingly hold that sexual abuse of one child may constitute substantial evidence of a risk to another child in the household—even to a sibling of a different sex or age or to a half sibling."]; *In re Ricky T.* (2013) 214 Cal.App.4th 515, 517 [grandfather's sexual abuse of his nine- and 12-year-old step-granddaughters supported jurisdiction over three-year-old grandson]; *In re Ana C.* (2012) 204 Cal.App.4th 1317, 1319-1320,

28

1325, 1332 [affirming jurisdiction over minor who was three or four years old at the time of hearing, based on finding that child's father began sexually abusing his stepdaughter when she was 10 or 11 years old].)  Israel Sr. cites to no authority holding the risk to a nonbiological child living in the home is any less than the risk to a biological child.

Finally, Israel Sr. argues there was evidence he had never sexually abused Israel Jr., pointing to Israel Jr.'s confirmation that nothing had ever happened.  However, a child may be removed if he faces a substantial danger to his well-being or if his sibling has been sexually abused.  (§ 361, subds. (c)(1) & (c)(4).)  Also, "'[t]he parent need not be dangerous and the child need not have been actually harmed for removal to be appropriate.  The focus of the statute is on averting harm to the child.'" (*In re M.D., supra*, 93 Cal.App.5th at pp. 856-857; accord, *In re Cole C.* (2009) 174 Cal.App.4th 900, 917.)  Further, the evidence that Israel Sr. had not abused his son does not contradict the evidence that Israel Sr. sexually abused I.F.  In light of Israel Sr.'s past conduct in committing egregious sexual abuse over an extended period of time, committing the abuse while Israel Jr. and other family members were home, continuing to deny the abuse, and failing to take any steps to address his deviant sexual behavior, the nature and weight of the evidence met the clear and convincing standard for removal and compels a finding as a matter of law in favor of the Department.

## DISPOSITION

We reverse the juvenile court's disposition order finding Israel Jr. was not in substantial danger to his physical health,

29

safety, protection, or physical or emotional well-being if released to Israel Sr.  We remand for a further disposition hearing consistent with this opinion.  On remand, the court shall consider the appropriate disposition based on the facts existing at the time of the hearing.  Because we reverse the juvenile court order releasing Israel Jr. to his father, we lift the stay we imposed on March 29, 2023 in granting the Department's petition for writ of supersedeas.  Israel Jr. remains detained from Israel Sr. pursuant to the November 14, 2022 detention order until a further disposition order is made.

                                        FEUER, J.

We concur:


        SEGAL, Acting P. J.



        STONE, J.